IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


FERN K. RICHMOND                                              PLAINTIFF


        v.             Case No. 04-3024


CONTINENTAL CASUALTY COMPANY,
CONTINENTAL ASSURANCE COMPANY,
CNA GROUP LIFE ASSURANCE COMPANY,
(now known as HARTFORD LIFE GROUP
INSURANCE COMPANY) and BAXTER
HEALTHCARE CORPORATION                                        DEFENDANTS


## MEMORANDUM OPINION & ORDER

Plaintiff brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, challenging defendants' decision to deny her application for long-term disability benefits. The defendants submitted the administrative record (the "AR") that was before the claims administrator. (Doc. 9) In addition, the plaintiff has submitted a "supplemental administrative record" (Doc. 12), which contains information not provided to the defendants for the initial determination of benefits or for the defendants' review on appeal. The parties have submitted briefs (Docs. 22, 23) on the issues before the Court and the matter is now ripe for consideration. For the reasons set forth herein, the decision of the defendants will be upheld, the plaintiff's claim will be denied, and this case will

be dismissed.

**Background**

1. The Plaintiff, Fern K. Richmond, worked for Baxter Healthcare Corporation (hereinafter "Baxter") on the assembly line. Her job required her to place tubes in products as they passed on a conveyor belt. (AR 42) The essential duties of her job included sitting, using a pedal under her bench, bending, reaching, pushing, and pulling. (AR 42) Her last day of work was November 7, 2001. (AR 42)

2. Plaintiff participated in an employee benefits plan sponsored by Baxter and issued and administered by CNA Group Life Assurance Company (hereinafter "CNA"). (AR 38) On or about December 5, 2001, the Plaintiff gave notice to CNA of her claim for short-term disability benefits.[1] (AR 41) The plaintiff described her condition as lower back pain from two degenerative discs. (AR 41) The plaintiff reported that she was scheduled for surgery for the condition on February 21, 2002. (AR 41) Short-term disability benefits were approved for the plaintiff for a period of time continuing until June 3, 2002. (AR 150) The plaintiff returned to work full-time on June 3, 2002; but, soon after, the plaintiff fell and turned her right ankle. (AR 145) Following this injury, the plaintiff became eligible for consideration for long-term

---

[1] Plaintiff's claim for short-term disability benefits is not at issue in this case.

disability benefits.  (AR 145)

3.  The employee benefits plan is funded by policy number SR-83079247.  (AR 14) The terms of the policy defines *disability* as follows:

> **How do We define Disability?**
>
> *Disability* or *Disabled* means that *You* satisfy the Occupation Qualifier or the Earnings Qualifier [not applicable in this case] as defined below:
>
> **Occupation Qualifier**
>
> *Disability* means that during the *Elimination Period* and the following 12 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1) continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation*; and
>
> 2) not *Gainfully Employed*.
>
> After the *LTD Monthly Benefit* has been payable for 12 months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1)  continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
>
> 2)  not *Gainfully Employed*.

(AR 18).

4.  The Policy further requires proof of disability as follows:

> **Proof of *Disability***
>
> The following items, supplied at *Your* expense, must be a part of *Your* proof of loss.  Failure to do so may delay,

suspend or terminate your benefits.

    1)    The date *Your* Disability began;
    2)    The cause of *Your* Disability;

    3)    The prognosis of *Your* Disability;

    4)    Proof that *You* are receiving Appropriate and Regular Care for *Your* condition from a Doctor, who is someone other than *You* or a member of *Your* immediate family, whose specialty or expertise is the most appropriate for *Your* disabling condition(s).

    5)    Objective medical findings which support *Your* Disability. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s).

    6)    The extent of *Your* Disability, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.

    7)    Appropriate documentation of *Your Monthly Earnings*. If applicable, regular monthly documentation of *Your Disability Earnings*.

    8)    If *You* were contributing to the premium cost, *Your* Employer must supply proof of *Your* appropriate payroll deductions.

    9)    The name and address of any *Hospital or Health Care Facility* where *You* have been treated for *Your Disability*.

    10)    If applicable, proof of insurance costs covered under other benefits included in the Policy.

**Continuing Proof of Disability**

*You* may be asked to submit proof that *You* continue to be *Disabled* and are continuing to receive *Appropriate and Regular Care of a Doctor*. Requests of this nature will only be as often as *We* feel reasonably necessary. If so, this will be at *Your* expense and must be received within 30 days of *Our* request. Failure to do so may delay, suspend or terminate *Your* benefits.

(AR 28)

5. The Policy also grants Discretionary Authority to the administrator:

> **Discretionary Authority**
>
> The Policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto. The Core Plan [administrator] and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The Core Plan [administrator] has delegated sole discretionary authority to CNA Group Life Assurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the Policy.

(AR 34)

6. The documentation submitted in support of plaintiff's claim for disability benefits reflects the following:

\* Initially, the plaintiff sought treatment from John F. Ferguson, M.D. of the Springfield Neurological Institute. The plaintiff was referred to Dr. Ferguson by Dr. Michael Hagaman for "evaluation of chronic back and leg pain of one year's duration and progressive severity." (AR 137) Dr. Ferguson noted that the plaintiff's MRI scan "demonstrates the presence of stenosis at the L3-4 and L4-5 levels of moderate severity . . . contributed to bulging discs at L3-4, L4-5 and also to a lesser extent at L5-S1." (AR 138)

\* The plaintiff again visited Dr. Ferguson on February 20, 2002. (AR 136) Dr. Ferguson noted that the plaintiff "has

experienced ongoing low back and bilateral low extremity pain. Repeat neurologic exam remains unchanged compared to January 2, 2002 . . . ." (AR 136) The plaintiff decided to proceed with surgery, specifically, a decompressive lumbar laminectomy at the L3-4 and L4-5 levels. (AR 136)

* Surgery was performed on the plaintiff on February 21, 2002. The surgery was performed by Dr. Ferguson. The plaintiff returned to Dr. Ferguson's office on March 12, 2002 for a follow up visit. (AR 135) Dr. Ferguson noted that the plaintiff was "doing quite well with resolution of back and leg pain." (AR 135)

* On April 22, 2002, CNA conducted a telephone interview with the plaintiff. (AR 164) The plaintiff stated that the pain radiating into her hips and down her leg has been relieved since surgery. The plaintiff stated that she currently does not take any medications for her back. (AR 164) However, she also stated that currently her left leg "doesn't do right," she feels like she is "walking crooked" and she can't walk as fast as she used to. (AR 164) Although the plaintiff stated that she tires easily, she also stated that her back hurts only when she over does it. (AR 164) According to the telephone interview, the plaintiff is able to cook, load the dishwasher, and do laundry. The plaintiff cannot stand at the sink to wash dishes, and avoids vacuuming. (AR 164) The plaintiff relayed that her back hurt if she sits for more than 30 minutes; and that steps are difficult for her to manage. The

plaintiff stated that she does prescribed back exercises daily and goes for walks outdoors. (AR 164) Further, the plaintiff stated that she likes her job, and is looking forward to returning to work. (AR 165)

    \*    On April 26, 2002, Dr. Ferguson advised that "[d]ue to increased back pain after surgery Fern should stay off work until May 20th. At that time she may return to work half days for two weeks and then full time after that. No heavy lifting, pushing or pulling." (AR 134)

    \*    Soon after returning to work, the plaintiff suffered a right ankle sprain while at work. (AR 141) The plaintiff sought treatment from Michael S. Hagaman, MD. Dr. Hagaman diagnosed her ankle sprain. (AR 140-141) Dr. Hagaman also took the plaintiff off work "until she goes back to see her neurosurgeon . . . ." (AR 140) Dr. Hagaman noted that at her appointment with her neurosurgeon, the plaintiff "is going to talk to him about her job and whether or not she is going to continue to tolerate full time or part time duty." (AR 140)

    \*    The plaintiff visited with Dr. Ferguson on June 13, 2002. (AR 133) Dr. Ferguson noted that the plaintiff attempted to return to work as of May 20, 2002, initially for several half days and that "returning to the assembly line proved to be essentially impossible because she immediately developed recurring low back and left-sided discomfort." (AR 133) Dr. Ferguson recommended a

7

physiatry consultation for 1) a physical therapy program for rehabilitation, and 2) a disability evaluation to see whether or not she should return to work and if so at what level. (AR 133) Dr. Ferguson additionally noted that the plaintiff is in need of additional physical therapy and should not return to doing assembly line work. Dr. Ferguson noted that a referral will be made to a physiatrist in the Mountain Home area. (AR 133)

\* Additionally, at the plaintiff's June 13, 2002 appointment with Dr. Ferguson, Dr. Ferguson took the plaintiff off work for "consult, rehab and disability evaluation with Physiatrist." (AR 132)

\* Dr. Ferguson also completed a Functional Assessment Tool dated June 18, 2002. (AR 143) Dr. Ferguson advised that as of August 1, 2002, the plaintiff should be able to perform work which is primarily seated with no lifting. (AR 143)

\* On July 25, 2002, CNA informed the plaintiff that her Long Term Disability benefits had been approved, with a benefits commencement date of June 13, 2002. (AR 119-120) The letter to the plaintiff stated

> Benefits under this policy are payable for 12 months if you are totally disabled from your own occupation. We will continue to review your medical information as it relates to your functional impairment and your ability to perform the substantial and material duties of your occupation. After 12 months, benefits will continue only if you are totally disabled from any occupation for which you are or become qualified by education, training or experience up to the maximum period payable as stated in the policy.

8

(AR 119)

* The plaintiff had an appointment with Ronald Pak, M.D., of St. Johns Regional Health Center Physical Medicine and Rehabilitation, on July 25, 2002. (AR 116-118) Dr. Pak noted that the plaintiff "reports chronic functional limitations", specifically, that "her ankles 'turn over'". Her ankles cause her to fall often. Dr. Pak noted that the plaintiff sprained her ankle when walking and her ankle just gave out. Dr. Pak noted her back pain, and her surgery in February of 2002. Dr. Pak stated that the plaintiff has been working on an assembly line for eleven years which requires sitting and manipulation of foot controls. Dr. Pak noted some evidence of some mild neuropathy – which could contribute to her ankle instability. Dr. Pak noted that "she has recurrent falls which would certainly be a problem in a work setting." Dr. Pak also noted that "[a]lthough she is able to do some sitting activities, I feel that her walking instability and recurrent falls is a significant safety issue in any work place." (AR 118)

* In October of 2002, the plaintiff was scheduled to began treatment with Paul Shurnas, M.D., of Ozark Orthopedics. (AR 114)

* Dr. Shurnas performed surgery on the plaintiff's ankle on November 8, 2002. (AR 103) According to Dr. Shurnas's operative notes, an MRI showed peroneal tendon tear and extensive synovitis. (AR 103-106) Dr. Shurnas's operative notes noted a good prognosis;

9

and he stated "I do not believe there will be significant disability in the foot." (AR 106)

* The plaintiff returned to Dr. Shurnas on January 20, 2003 for a postop follow-up. (AR 102) Dr. Shurnas noted excellent progress; however, also noted that the plaintiff "is still having some swelling and weakness." (AR 102) The plaintiff remains in an ankle brace for support – and still doesn't have strength or balance. (AR 102) Dr. Shurnas noted that the plaintiff is ready for physical therapy. Dr. Shurnas states that he was contacted concerning work status; and, notes that the plaintiff "is, by no means, at maximum medical improvement." Further Dr. Shurnas notes

> [a]s far as work status goes, she could certainly sit down and answer a phone but at her work her job would entail her sitting down and working pedals for the manufacturing equipment and she is not ready for that. There is also another complicating matter. She has an ongoing problem with her back and this is currently being addressed by outside physicians. She would be limited to a seated position for any length of time due to her back, as well. So, by both accounts, she really isn't going to be able to do a seated position and use the pedals. From my standpoint, she could do a seated position and answer the phone or paperwork but I think her back would preclude her from that and I would refer that question to her spine physician.

(AR 102)

* Dr. Shurnas also completed a Functional Assessment Tool for CNA, dated January 7, 2003. (AR 101) Dr. Shurnas noted that the plaintiff "needs spine clearance" before being capable of performing seated work with negligible lifting. (AR 101) Dr. Shurnas also noted "no work based on spine problem." (AR 101)

10

* CNA sought clarification of Dr. Shurnas's opinion with a Functional Assessment Tool seeking medical information regarding the plaintiff's back that would preclude her from doing a primarily seated job with the flexibility to stand and sit as needed. (AR 97)

* Dr. Shurnas completed the Functional Assessment Tool and noted "I don't evaluate backs or disability evals – patient stated her back was a problem – (see dictated note)." (AR 96)

* In further response to the Functional Assessment Tool, Dr. Shurnas included a letter dated March 6, 2003. (AR 95)

> With respect to Fern Richmond's ankle, I think she can do a seated job and I have absolutely no problem with her going back to work with this restriction. The patient is the one that stated her back is a problem and that it would proclude (sic) her from doing a seated job. If you have an opinion from Dr. Pauck (sic), who felt her ankle would be a hinderance (sic) in her returning to work, then I suggest you work that out with Ms. Richmond. I do not do disability evaluations and I do not do evaluations on the back and so I would refer any questions to Dr. Pauck (sic) about her back since he felt her ankle would be the main hinderance (sic) in her returning to work.
>
> At this point, she has made good progress in her ankle. I've had her in physical therapy with the balance board and testing and, based on her objective examination, I think she should be able to go back to work and at least perform a seated job. I stated in my note on January 20, 2003, she has an ongoing problem with her back and it is being addressed by an outside physician, which I assume is Dr. Pauck (sic) and, again, I would refer all of that to him. I think from my stand point, it's fine that she goes back to work for a seated job.

(AR 95)

7. On March 10, 2003, CNA denied plaintiff's claim for long-

term disability benefits, explaining:

> Your 12 month own occupation period will end on 6/12/03.
>
> During our conversation on 2/19/03, you reported that you go to physical therapy three times per week to work on range of motion for your ankle. You reported that occasionally you will use a cane to get around because too much walking causes your ankle to swell. You stated that you are able to keep your "house in order" and do household chores such as wash dishes, do laundry and prepare simple meals. You mentioned that you can sit for 30-45 minutes before needing to change positions, and you are able to drive and do your own grocery shopping.
>
> You mentioned in our previous conversation that your last visit with Dr. Ferguson for your back was in June. In Dr. Ferguson's 6/13/02 office note, he reported that overall you are "significantly improved and more ambulatory than preoperative." In a letter from Dr. Shurnas dated 3/6/03, he stated that he does not do evaluations on the back and you told him that you could not do a seated job because of your back. Dr. Shurnas stated that from his standpoint regarding your ankle, you "can do a seated job" and he has absolutely no problem with you "going back to work with this restriction." Dr. Shurnas recommended going back to your treating physician for an evaluation of your back. In Dr. Pak's disability assessment done on 7/25/02, he reported that he thinks that you are able to do sitting activities and he was more concerned with your walking abilities and falls that would bring up safety issues in a work environment.
>
> . . . .
>
> To assess your vocational capabilities, your file was referred to me for a vocational assessment. During our conversation you reported that you have your GED and you have worked as a retail sales associate and you had a daycare in [your] home.
>
> Based upon your age, current level of education, work history, geographical location and level of function, it was assessed that you are able to perform the following alternative occupations:
>
> --   Information Receptionist,
> --   Greeter,

12

>   -- Control Access Guard,
>   -- Customer Service Representative.
>
> In summary, the medical and vocational documentation in your file does not support that you remain disabled from any occupation at this time. Therefore, your benefits will end on 6/12/03 and no additional benefits will be issued beyond this date.

(AR 90-91).

8. In the March 10, 2003 denial of benefits letter, CNA advised the plaintiff of her appeal rights:

> If you disagree with our decision, you have the right to appeal under regulations specified by the Employee Retirement Income Security Act (ERISA) 1974 as amended. If you have additional medical information not mentioned above or wish us to reconsider our decision, you should: submit your formal request for reconsideration in writing to my attention within 180 days of the date of this letter . . . .
>
> Our decision will be reconsidered at the time of receipt of your information. If this information does not alter our decision, you will be informed of this and your claim will then be submitted to the Appeals Committee for a formal review. The Committee will issue a ruling within 45 days of receipt of your appeal as mandated by the Employee Retirement Income Security Act (ERISA) 1994, as amended. This regulation allows for an additional 45 days to reach a decision if necessary, however you will be notified within the first 45 days if this will require an extension of time to reach a decision. This decision will be in writing and mailed directly to you or your representative.

(AR 91)

9. The plaintiff retained counsel and appealed the denial of benefits in a letter dated March 20, 2003. (AR 71)

10. On March 26, 2003, CNA acknowledged receipt of the plaintiff's appeal. (AR 70) CNA also provided plaintiff's counsel with the claims file and provided 30 days within which to complete

the appeal and provide additional information for CNA's review. (AR 70)

12. Through a letter dated April 28, 2003, plaintiff's counsel requested additional time within which to complete the appeal. (AR 69)

12. CNA responded in a letter dated April 29, 2003, and provided 30 additional days to submit information for review. (AR 67) CNA further stated "[i]f no additional information is received by 5/29/03, your client's claim file will be submitted to the appeals committee." (AR 67)

13. Through a letter dated June 6, 2003, CNA notified plaintiff's counsel that despite the extension until 5/29/03, "I have not received any additional information that would change our original decision. Therefore, the decision that your client is able to perform alternative work is unchanged." (AR 65) CNA further noted that "[a]t this time, your client's file will be forwarded to the appeals committee." (AR 65)

14. On July 21, 2003, CNA notified plaintiff's counsel of its decision to uphold its original decision to deny the plaintiff's claim for long term disability benefits. (AR 58-59) The letter from CNA stated:

> When we evaluate disability, medical evidence is used to determine the condition, the impairment the condition places on the claimant's functionality as well as validate and substantiate the claim. Our determination is based on the information documented in the medical records, the physician's observations, and treatment of the claimant and how it relates to their functional

capabilities when performing the material and substantial
duties of an occupation.

While we are not disputing the presence of Ms. Richmond's
medical conditions, the medical evidence submitted and
reviewed does not reveal worsening of her condition and
the records provided do not report medical findings
consistent with an incapacitating condition causing a
loss of functionality that would prevent her from
performing the duties of the occupations identified
within our vocational assessment. Her activities of
daily living are consistent with a low-level physical
demand position such as those identified. These
occupations are merely samplings of occupations available
within her stated limitations.

In conclusion, the medical information reviewed and
evaluated does not support Ms. Richmond's inability to
work in an alternative occupation. Therefore, based on
the medical evidence reviewed, the termination of her
long-term benefits was determined by Appeals to be proper
and correct.

(AR 59)

15. The plaintiff's attorney again contacted CNA through a letter dated January 22, 2004. (AR 52) The letter stated: "Please update us on the status of the above mentioned claim. The last we heard, the file was to be forwarded to the appeals committee, 6/6/03 and we haven't heard anything since then." (AR 52)

16. On January 29, 2004, CNA responded to the plaintiff's counsel, enclosing a copy of CNA's July 21, 2003 letter denying plaintiff's appeal. (AR 51)

**Discussion**

\*   **Standard of Review**

1. ERISA provides a plan beneficiary with the right to judicial review of a benefits determination. *See* 29 U.S.C. §

1132(a)(1)(B).  A denial of benefits by a plan administrator must be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the administrator's decision is reviewed for an abuse of discretion.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Under the terms of plaintiff's employee benefits plan, the plan administrator has "discretionary authority to determine . . . eligibility for and entitlement to benefits under the Policy."  (AR 34)  Accordingly, defendants' decision should be reviewed for an abuse of discretion.

2.  Under the abuse-of-discretion standard, the Court must determine whether a reasonable person could have reached the same decision.  *See House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001).  This inquiry focuses on the presence or absence of substantial evidence supporting the administrator's decision.  *Id.*  While the administrator's decision need not be supported by a preponderance of the evidence, there must be "'more than a scintilla.'"  *Id.* (citations omitted).

3.  Although the plaintiff's employee benefits plan clearly provides discretionary authority to the administrator, and is therefore subject to the abuse of discretion standard, the plaintiff argues that a conflict of interest should alter the standard of review.

As set forth in this Court's Order of February 15, 2006 (Doc.

16

26), "[a]lthough a conflict of interest *could* affect the standard of review, 'not every allegation of impartiality alters the standard of review. A plan beneficiary is not entitled to less deferential review absent material, probative evidence demonstrating that a palpable conflict of interest existed, which caused a serious breach of the administrator's fiduciary duty.' Farley v. Arkansas Blue Cross and Blue Shield, 147 F.3d 774, 776 (8th Cir. 1998). Moreover, a conflict of interest of a level sufficient to affect the standard of review 'will ordinarily be apparent on the face of the administrative record . . . [t]hus, the district court will only rarely need to permit discovery and supplementation of the record to establish these facts.' Id. at n.4. *See also* Abram v. Cargill, Inc., 2003 WL 1956218 (D.Minn. 2003)."

Plaintiff's pleadings in this case simply *fail* to point to any portion of the administrative record, or other evidence, to support her claim of a conflict of interest. Therefore, plaintiff's argument concerning a conflict of interest will not affect the standard for this Court's review – which remains *abuse of discretion*.

**\*     Record on Review**

4. CNA has submitted the administrative record (the "AR") that was before the claims administrator. (Doc. 9) In addition, the plaintiff has submitted to the Court a "supplemental

administrative record" which contains information not provided to the defendants for the initial determination of benefits or for the defendants' review on appeal.

5. As set forth in this Court's Order of September 6, 2005 (Doc. 17), the plaintiff has offered "no explanation as to why the documents at issue were not submitted to the plan administrator. Having failed to submit the documents to the plan administrator or to explain his failure to do so, plaintiff will not be allowed to supplement the record with these documents. See Brown v. Seitz Foods, Inc., 140 F.3d 1198, 1200-1201 (8th Cir. 1998)." Accordingly, the Court's review shall be limited to the administrative record filed by the defendants (Doc. 9); and, the record filed by the plaintiff (Doc. 12) shall not be considered.

**\*   Defendants' Denial of Benefits**

6. In its initial decision denying plaintiff benefits, CNA found that plaintiff's file did not support a finding that she remains disabled from any occupation. CNA found that based upon the plaintiff's age, current level of education, work history, geographical location and level of function, the plaintiff is able to perform the following alternative occupations: information receptionist, greeter, control access guard, and customer service representative. (AR 90-91)

Specifically, CNA noted that although Dr. Pak initially limited the plaintiff's working ability due to her ankle, after

surgery, Dr. Shurnas opined that the plaintiff *could* resume working in a "seated job." Additionally, CNA noted that during the plaintiff's last medical appointment concerning her back, Dr. Ferguson noted that the plaintiff's condition as "significantly improved and more ambulatory than preoperative." (AR 90-91)

7. Then, CNA denied plaintiff's appeal, finding that the medical records did not support a disabling condition that would keep the plaintiff from working in "any" occupation. (AR 58) CNA noted that the plaintiff was cleared by her orthopedic doctor to perform seated activities; and, found no evidence to support a change in her back condition which would prevent such work. (AR 58-59)

8. As set forth above, the decision to deny the plaintiff long-term disability benefits is being reviewed by this Court for abuse of discretion. It is clear that prior to the plaintiff's ankle surgery, her *ankle* condition (rather than her back condition) was the limiting one with respect Dr. Pak's disability evaluation. And, following surgery, the plaintiff's orthopedic doctor cleared her for work in a seated position. There is no information or medical records which support a change in her back condition that would prevent work in a seated position, with the flexibility to move around in regular intervals. Therefore, the Court finds that the information before CNA was clearly sufficient to support its denial of benefits. *See* House v. Paul Revere Life Ins. Co., 241

19

F.3d 1045, 1048 (8th Cir. 2001).

**Conclusion**

9. Based on the foregoing, the Plaintiff is not entitled to a judgment against the defendants. Accordingly, the Plaintiff's claim is hereby **DENIED** and this case is **DISMISSED**. Each party shall bear its own costs and attorney's fees.

IT IS SO ORDERED this 22nd day of May 2006.

<u>/S/JIMM LARRY HENDREN</u>
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE